S. O. WALD, Appellee, v. AUTO SALVAGE & EXCHANGE COMPANY, Appellant.

**REPLEVIN: Identification of Property.** Evidence reviewed, and held
1  to so identify an automobile as to present a jury question on the issue of plaintiff's ownership, even though the manufacturer's numbers thereon had been obliterated.

**TRIAL: Excessive Verdict.** A verdict for $450 for property worth
2  $425 does not indicate passion and prejudice on the part of the jury.

REPLEVIN: Defeating Levy of Writ—Effect. Defendant in replevin
3  for a stolen automobile must answer for the full value thereof, even
though plaintiff lays no claim to certain substituted parts of the
car, when defendant defeats the levy of the writ by disposing of
or secreting the car, immediately after learning of plaintiff's claim
of ownership.

REPLEVIN: Interest on Money Judgment. Interest on a money judg-
4  ment taken in a replevin action in lieu of the property is allowable,
at least from the date of the commencement of the action.

*Appeal from Polk District Court.*—HUBERT UTTERBACK, Judge.

NOVEMBER 23, 1920.

ACTION in replevin to recover possession of a Ford auto-
mobile or the value thereof. Plaintiff claimed that defendant
disposed of or concealed the car before service of the writ could
be had. Trial to a jury, and a verdict for plaintiff for $450.
Thereafter, plaintiff remitted $25 of the recovery, and elected to
take a money judgment, with interest. Judgment was entered
for $425 and interest, and the defendant appeals.—*Affirmed.*

*Blake & Blake,* for appellant.

*Parsons & Mills,* for appellee.

PRESTON, J.—1. Plaintiff's car was stolen upon the streets
of Des Moines, March 15, 1918. Plaintiff lives in Story County.
He claims to have found the car on March 29th, in possession
of the defendant, at its place of business in
Des Moines, and that it was in possession of
the defendant on April 1, 1918, when the
action was commenced. Defendant, at the close of all the testi-
mony, moved for a directed verdict, which motion was over-
ruled. The main point relied upon by appellant for reversal
is that the evidence is not sufficient to sustain the finding of
the jury. The contention is that the identification of the car
was not sufficient. We shall not go into the details of the evi-
dence. Defendant contends that the car in its possession, which
plaintiff claims as his, had been purchased and resold a time

1. REPLEVIN: iden-
tification of
property.

or two by it, and it seeks to trace the car by number, by the
parties from whom it purchased and to whom it sold.  On these
different transfers there was no registration.  Plaintiff does not
seek to identify his car by the numbers alone, but does so by
marks, scratches, and so on.  He claims and testifies that the
numbers on the engine and machinery had been ground off, and
some of the figures in the number changed in a crude manner,
by a chisel or some such instrument.  If his claim is true, that
the numbers are ground off and others substituted, it would,
of course, be difficult for him to identify by number.  We see no
reason why it is not competent to identify by other means, under
such circumstances, if such identification is sufficient to go to
the jury, and convince the jurors.  Plaintiff seems to have satis-
fied the jury that the car claimed was his, and we think the evi-
dence was sufficient to go to the jury on that point, and to sus-
tain the finding.

Plaintiff reported the theft of his car at once to the police,
and the next morning to the sheriff.  He gave the numbers of
his car, and gave a description of some of the marks by which
to identify his car.  In a few days, he was notified by the police
that there was a stolen car at Kansas City that answered the
description, and plaintiff went to Kansas City and identified
the two rear wheels by rope marks and knife cuts.  The rest of
the car was not his.  Plaintiff returned on March 29th, and on
the 29th, in the afternoon, he went to defendant's secondhand
place, thinking to buy another car—a runabout.  In looking at
the runabouts, he says he noticed one of the front doors of his
car on a runabout.  He identified the door by upholstery tacks
he had driven in a certain way, shortly before his car was stolen.
At this he became suspicious, and he looked at the other cars,
and saw one that looked like his, except that the wheels had been
changed.  He says:

"They just slipped my wheels off and put on different
wheels, but the one wheel,—on the left front wheel, there was
a little bulge in that, and there was a little bulge in mine; and
that was the reason why,—well, I didn't say anything then.
Then I looked inside in the back seat, and there was my carpet,
because I had my oil can tip over one day, and the oil poured
out on the carpet, and I took the carpet up and I just scraped

the oil up; and there I found the marks of my scraper, and the carpet with the oil spot on it, just the same; and I identified my rubber mat. We put a cut-out on, and when we cut out the hole for the cut-out plunger that you put your foot on,—we put a new cut-out on then,— the knife slipped and run quite a ways down into the mat; and here was my mat, and I knew it just as plain as I know my child's face, because it was made when I cut out the hole. There was my matting. Well, I commenced to look around, and I knew that the back spring, I had made a mark on that. The blacksmith up there had made a coupling that we took off of what is called the rear spring. We put this coupler on, so we could haul a trailer, * * * that coupler made a mark on my rear spring. It was not a regular coupler, made by the factory, but by a blacksmith; and I took a lath hatchet, with these little kind of saw teeth on the end of it that they used to put lath on with; and in striking,—I struck a couple of times,—I struck the rear spring; and here was the mark of the hatchet; and here was the mark of that coupler, just as plain as the day I took it off. Well, then, I looked around, and I remembered we ripped the hood, and my wife sewed that hood up, and I went around to where she put the patch on the left side; so there was the hood sewed up just the way my wife sewed it up. It was just a couple of days before the car was stolen when the oil was there, and we broke the cap on the gasoline tank. I guess I was trying to turn it the wrong way, and I gave a tap and broke it, and we broke it in a funny way, and there was a little sharp point, and I know I touched that point, and it was sharp, and it kind o' scratched my fingers. Well, sir, there was my broken cap. Well, then, I went into the back seat, and there was my curtains, rolled up and tied just as I had tied them, with a sash cord,—just as I had tied them myself, with the knots on it. We had been hunting walnuts, and I had several,— the reason why we had this sash cord, we went walnut hunting in the fall, and I had some sash cord that I used on a tent, and I took them off of the tent, and had them with us in the back seat.''

Many other circumstances are given, bearing upon the question of identification, some of which we shall refer to with less detail.

He says there was a new pair of chains in the car he was driving; some brass tacks he had driven, in place of screws which had worked out; a piece of his grip. He testifies that, after he had found all these marks, he knew it was his car, except the wheels; and that he then told defendant, or its employees, that it was his car, and that it was a stolen car; and that he asked them to help him find the thief; that they agreed to do this, but that the man who first showed him the car nearly fainted; that he had to sit down, and got as white as a sheet, when witness said that; that witness asked them to get into the car and go to the man he had bought of, and the other people who knew of the markings; and that he was then told that the defendant had bought the car last fall. Witness called their attention to the fact that there was a card on one of the wheels, which said, "Bought 3-22-18," and he asked them how it came that they bought it last fall; and they said they bought it twice. He again asked them to go with him to different ones to identify the car. They finally told plaintiff that he had not sufficiently identified the car, and told him that he was trying to spoil a sale, and the sooner he would get out of the place, the better. Plaintiff then started for the sheriff's office, but was excited, and not feeling well; so, on the way, telephoned the sheriff's office, and waited until two deputies came. Thinks he was gone from defendant's place about half an hour. The deputies and plaintiff went to defendant's place, and plaintiff asked them where the car was, and they said they had sold it. Plaintiff expressed surprise to them that they should have sold the car after he had told them it was his, and a stolen car. Finally, one of them told plaintiff that the car he had looked at inside, was out in the alley. He claims they had switched doors on him; that the one in the alley was not his car, and not the one he had seen inside, though some of the things that were in the other car had been placed in this, and some of the things which he had before seen in his car were found in other cars. Plaintiff went home that evening, but came back on Saturday, the 30th, about noon, and he had the papers ready to serve the writ of replevin; but the courthouse was closed in the afternoon, and he had to let it go till Monday, when he and the sheriff went to serve the writ, and there was nothing in sight, as he puts it. He says that they

didn't even have that one in the alley; so he didn't get a thing. At that time, there were dozens of cars in the alley, but the one with his things in was gone. That is the reason the writ was not served. The car was reasonably worth $425. There is much more of similar testimony. Plaintiff says he was sick, and a part of the time excited, and somewhat confused. At one point, he was perhaps confused as to one of the numbers. A deputy sheriff, who was also state agent, working on automobile thefts, testifies as to some of the marks of identification plaintiff had reported in the first instance; that he went to defendant's place of business with plaintiff on the 29th, and that, when they looked for the car, it was not on the floor. He thinks they told him they had sold the car, at which plaintiff seemed dumbfounded; and finally they directed them out in the alley. The car in the alley had some resemblance, and, looking through the car, they found the curtains under the back seat, and the sash cord, etc.

Clearly, this evidence, standing alone, would justify a finding by the jury in plaintiff's favor. Some of his evidence is not disputed. Much of it is. Some of the evidence tends to show that some of the minor parts were changed to other cars, and some of the things in the car, which plaintiff alleges to have been his, were put in other cars. The effect of this evidence would be to confuse, and to prevent, to some extent, identification. Defendant's evidence, standing alone, would justify a verdict for the defendants. Since there was a conflict, the jury had the right to believe the plaintiff. Clearly, there was a conflict in the evidence. The jury has spoken, and we are relieved of the  responsibility of passing upon the credibility of the witnesses and the weight to be given their testimony, and precluded from interfering with the verdict.

2. It is thought that the verdict is the result of passion and prejudice, for that the verdict returned was for $450, or $25 more than the value of the car, as shown by the evidence. The difference is not so glaring as to shock the conscience, and indicate passion or prejudice.

2. TRIAL: excessive verdict.

3. Appellant contends further that the court erred in holding, as a matter of law, that plaintiff could maintain replevin for the whole car, upon attempting to prove identity to

only a few insignificant and inseparable parts, disclaiming other parts of the car. Appellant cites authority to the proposition that a single piece of property, in which there is a joint ownership, which is not capable of separation, and not susceptible of seizure and delivery to the plaintiff, is not subject to replevin. There is no trouble about this. Plaintiff was not asking to seize and recover inseparable parts. He was asking to recover the car as a car, or its value. The identification of inseparable parts would tend to identify the whole car. It was still a car, even though the hind wheels and one of the doors had been removed, and replaced by others. Had the car remained in defendant's possession, so that the writ of replevin could have been served, the question would have been as to the possession of the car. Being unable to find the car, plaintiff asks judgment for its value. It became, in effect, an action in detinue, to recover the value of the car. If there had been a conversion of the car by the defendants, or they had concealed it, or if they had sold it, as the evidence tends to show, after they had been informed by plaintiff that it was a stolen car, and plaintiff's property, they would be liable to plaintiff for its value. Plaintiff elected to take a money judgment, and was entitled to recover the value, since the property could not be found, and with interest from the date when the suit to recover was commenced. *Sheffield v. Hanna*, 136 Iowa 579, 588.

*3. REPLEVIN: defeating levy of writ: effect.*

Appellant contends that interest should have been allowed only from the date of the judgment, and cites *Bonnot Co. v. Newman Bros.*, 109 Iowa 580, 585. In that case, plaintiff had not elected to take a judgment for money, in lieu of the property, and the value of the property at the time the suit was brought was not shown. Other circumstances in that case are different from the instant case. Under the circumstances there, the court held that interest should not have been allowed from the time of the commencement of the action. We think the instant case is governed by the *Sheffield* case.

*4. REPLEVIN: interest on money judgment.*

There may be one or two other minor points suggested, but

those discussed are controlling. There is no prejudicial error, and the judgment is—*Affirmed.*

WEAVER, C. J., EVANS and SALINGER, JJ., concur.